# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: March 26, 2020

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| BRUCE FEDEWA, | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 17-1808V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Decision Awarding Damages; Table Injury; |
| AND HUMAN SERVICES, | * | Pain and Suffering; Influenza ("Flu") |
| | * | Vaccine; Guillain-Barré Syndrome ("GBS"). |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * | | |

Isaiah Richard Kalinowski, Maglio Christopher & Toale, P.A., Washington, DC, for petitioner.
Christine Mary Becer, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION AWARDING DAMAGES[1]

**I.   INTRODUCTION**

On November 17, 2017, Bruce Fedewa ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, et seq., ("the Vaccine Act").[2]  Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine administered to him on October 10, 2016.  Petition at 2-4.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012).  All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

1

For the reasons set forth below, the undersigned finds that $180,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering and emotional distress.

## II.    PROCEDURAL HISTORY

Mr. Fedewa filed his petition for compensation on November 17, 2017.  Petition (ECF No. 1).  He filed medical records on November 30, 2017.  Petitioner's Exhibits ("Pet. Exs.") 1-12.  An initial status conference was held on January 17, 2018 in which additional evidence was requested.  On March 5, 2018, petitioner filed additional medical records.  Pet. Ex. 13.  Petitioner filed his affidavit, additional medical records, and Statement of Completion on April 3, 2018.  Pet. Exs. 14-15 (ECF Nos. 13-14).  Respondent filed his Rule 4(c) Report on September 17, 2018, in which he did not contest that petitioner is entitled to compensation.  Respondent's Report ("Resp. Rept.") at 1.  On September 21, 2018, the undersigned issued an entitlement ruling finding for the petitioner.  Ruling on Entitlement dated Sept. 21, 2018 (ECF No. 22).  The undersigned then issued a Damages Order requesting the parties to informally resolve the issue of damages.  Damages Order dated Sept. 21, 2018 (ECF No. 23).

On October 22, 2018, petitioner filed additional affidavits, work information, and medical expense documentation to support his damages claim.  Pet. Exs. 16-18.  On December 6, 2018, petitioner filed updated medical records, and on January 15, 2019, petitioner filed additional affidavits.  Pet. Exs. 19-21.  While the parties informally resolved unreimbursable expenses and lost earnings, they were unable to agree on the appropriate compensation for petitioner's pain and suffering.  Pet. Status Rept., filed May 13, 2019 (ECF No. 38).

The undersigned scheduled a Rule 5 status conference on damages for July 10, 2019.  During the status conference, the undersigned shared her preliminary finding that petitioner's case is comparable to Johnson v. Secretary of Health & Human Services, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018).  Rule 5 Order dated July 11, 2019, at 2-3 (ECF No. 39).  The undersigned encouraged the parties to again consider informal resolution.  Id. at 3.

On August 12, 2019, respondent filed a status report stating the parties were still at an impasse regarding the appropriate amount of compensation for Mr. Fedewa's pain and suffering.  Resp. Status Rept., filed Aug. 12, 2019 (ECF No. 41).  Respondent requested that the undersigned issue a damages decision.  Id.  On October 24, 2019, Mr. Fedewa filed his damages memorandum demanding a minimum of $180,000.00 for pain and suffering.  Pet. Memorandum of Law in Support of Petitioner's Motion for Findings of Fact and Conclusions of Law Regarding Damages ("Pet. Mem. on Damages"), filed Oct. 24, 2019, at 10 (ECF No. 43).  Respondent provided his response on November 7, 2019, taking the position of $125,000.00 as appropriate compensation for petitioner's pain and suffering.  Resp.'s Brief on Damages ("Resp. Br. on Damages"), filed Nov. 7, 2019, at 1 (ECF No. 44).

The issue of pain and suffering damages is ripe for adjudication.

**III.     FACTUAL HISTORY**

Mr. Fedewa was born on November 22, 1962. Petition at ¶ 1. He resides in Holt, Michigan with his wife and seven children on a hobby farm. Pet. Ex. 20 at ¶¶ 2, 4. He works full-time, and often overtime, as a dental equipment repairman. Id. at ¶ 2. His medical history includes injuries to his right elbow, left knee pain and surgery, arthritis, obstructive sleep apnea, and cholesterol management, though none of these issues appear to contribute to his injury in this case. Petition at ¶ 2; Pet. Ex. 2 at 2-10; Pet. Ex. 3 at 2; Pet. Ex. 8 at 6; Pet. Ex. 20 at ¶ 3.

On October 10, 2016, Mr. Fedewa visited Ingham County Health Department and received the measles, mumps, and rubella vaccine, flu vaccine, Tetanus-diphtheria-acellular pertussis vaccine, and hepatitis A and B vaccine. Pet. Ex. 1 at 1. He received these vaccinations in preparation for an overseas mission trip to Ukraine. Pet. Ex. 20 at ¶ 7.

On October 20, 2016, Mr. Fedewa visited the Memorial Healthcare Emergency Department complaining of bilateral numbness in his hands and feet and neck pain. Pet. Ex. 8 at 5, 7. After a computed tomography scan without contrast, Mr. Fedewa was discharged home with a primary impression of paraesthesias. Id. at 21. On October 21, 2016, Mr. Fedewa visited the Sparrow Hospital Emergency Department and explained worsening symptoms of numbness in his feet and fingertips. Pet. Ex. 6 at 57. Mr. Fedewa received a lumbar puncture and a prescription for prednisone. Id. at 65-66. He was discharged home. Id. at 66.

Mr. Fedewa averred that his condition continually deteriorated over the next two days. On October 23, 2016, he fell in his yard and was unable to get up until his family returned home and found him on the ground, crying and scared. Pet. Ex. 20 at ¶ 13. His wife brought him to the Sparrow Hospital Emergency Department. Id. Mr. Fedewa presented with numbness in both hands and legs, difficulty walking, and gait disturbance. Pet. Ex. 6 at 113. After another lumbar puncture was performed, the physician noted that Mr. Fedewa was likely experiencing acute inflammatory demyelinating process ("AIDP"). Id. at 120. The physician admitted Mr. Fedewa. Id. at 113. Regarding this admission process, Mr. Fedewa recounted several very painful moments, particularly of his second lumbar puncture and electromyography ("EMG"):

> The doctor stuck the needle into my spine for the tap and missed. The pain was excruciating. . . . He apologized and tried again successfully. . . . With the spinal tap finished, the triage nurse went to put in the IV drip, the doctor was talking to me and trying to distract me, but I could feel something running down my arm. I glanced over and along with the pain of a needle digging around in my arm, there was blood running down my arm and dripping onto the floor. . . . The next day they decided I needed an EMG. . . . The doctor performing the EMG did not know how to run the test. . . . She poked me deeply with a needle and shocked me hundreds of times for over an hour. Then her supervisor came in and looked over results. He pulled the doctor aside and asked how she got those results, then proceeded to redo most of the tests over again for another hour. I was already frazzled, traumatized and trembling with pain . . . . This was the worst experience of my life, but it was only the beginning.

Pet. Ex. 20 at ¶¶ 15-17. Mr. Fedewa's October 24, 2016 EMG results were highly suggestive of AIDP and he received a GBS diagnosis. Pet. Ex. 6 at 286, 319. He began the first of his five IVIG treatments on October 25, 2016. Id.

On October 26, 2016, Mr. Fedewa reported back pain, thigh pain, worsening numbness in his legs, and difficulty swallowing. Pet. Ex. 6 at 202. Physicians added gabapentin and Tramadol to help control his pain. Id. The records also reflected Mr. Fedewa's anxiety, for which he was prescribed Xanax (alprazolam). Id. at 196. Mr. Fedewa felt humiliated when nurses had to help him use the restroom, particularly when he had difficulty passing stools. Pet. Ex. 20 at ¶ 23.

Mr. Fedewa recounted in his affidavit that the IVIG treatments made him agitated. Pet. Ex. 20 at ¶ 19. He stated, "I did not sleep for the first five days in the hospital because [IVIG treatment] set my nerves so on edge. . . . So many hours were spent totally sleepless, still losing control of my limbs and getting number. . . . During those long sleepless nights, I wanted to die." Id. at ¶ 20. Medical records note these side effects on the fourth day of IVIG treatment. Pet. Ex. 6 at 264. Mr. Fedewa received a pre-treatment Benadryl for his final dose on October 29, 2016, which eased his agitation. Id. at 266. He recollected that he was able to sleep through the night following that IVIG treatment. Id.; Pet. Ex. 20 at ¶ 21.

During the two-week period of hospitalization and rehabilitation, Mr. Fedewa received eleven inpatient occupational therapy sessions. Pet. Ex. 6 at 176, 193, 235, 247, 291, 663, 677, 699, 722, 747, 759. He was discharged from hospitalization on October 30, 2016 and admitted to inpatient rehabilitation until November 3, 2016. Id. at 319, 771. At the time of his discharge from rehabilitation, Mr. Fedewa was still experiencing numbness in both feet and overall weakness. Id. at 770. He participated in outpatient physical therapy from November 7, 2016 to January 26, 2017, completing twenty-two physical therapy sessions. Pet. Ex. 4 at 48-125.

Mr. Fedewa followed up with his primary care physician, Dr. Erik Werk, on December 28, 2016. Pet. Ex. 14 at 64-67. He complained of depressed mood and continued unsteadiness on his feet. Id. at 64. He was still taking gabapentin for intense nerve pain. Id. at 65. On January 31, 2017, his physician noted that Mr. Fedewa continued experiencing anxiety and prescribed him Wellbutrin. Id. at 59-63. Mr. Fedewa stopped taking gabapentin at this time and expressed the need to get back to work. Id. at 60; Pet. Ex. 20 at ¶ 32. His physician instructed a twenty-five pound weight restriction for his return to work. Pet. Ex. 14 at 62. Mr. Fedewa expressed that returning to work was painful and that he had to take significant breaks after each service call. Pet. Ex. 20 at ¶ 34.

Mr. Fedewa showed some improvement at his February 28, 2017 follow-up with Dr. Werk but continued to experience fatigue and weakness. Pet. Ex. 14 at 54, 57. Dr. Werk also increased the Wellbutrin dosage to help with Mr. Fedewa's continued anxiety. Id. at 57. At the April 11, 2017 appointment, Mr. Fedewa reported continued numbness in hands and toes, and fatigue. Id. at 49. The records from his June 13, 2017 and September 21, 2017 appointments show that Mr. Fedewa continued to experience numbness, fatigue, and mild GBS symptoms despite improvements. Id. at 33-38, 44-47. Mr. Fedewa stopped Wellbutrin on September 12, 2017. Id. at 39, 43.

On December 19, 2017, Mr. Fedewa was evaluated for and diagnosed with moderately severe depression by Dr. Werk. Pet. Ex. 14 at 26-32. He experienced little interest or pleasure and had chronic fatigue and a depressed mood. Id. at 26. Mr. Fedewa resumed Wellbutrin at this visit for his depression. Id. at 31. His affidavit states, "I was exhausted, depressed . . . at times wishing my life were over." Pet. Ex. 20 at ¶ 36.

At his April 17, 2018 appointment, Mr. Fedewa reported continued depression, difficulty functioning, fatigue, and muscle weakness. Pet. Ex. 19 at 20. At his July 25, 2018 visit, Mr. Fedewa's depression had improved and he stopped taking Wellbutrin. Id. at 27, 31. His fatigue similarly improved though it did not completely go away. Id. at 27. He did not report weakness or numbness. See id. at 27-31. During this time, Mr. Fedewa was still unable to participate in activities with his family due to his constant fatigue and depression. Pet. Ex. 18 at 1-2; Pet. Ex. 21 at ¶¶ 12-14. His children missed story-time and play-time with their father. Pet. Ex. 18 at 1-2. Mr. Fedewa stated that physical and social activities he once enjoyed, such as biking, swimming, and handing out drinks with his daughter as part of weekly student outreach at Michigan State University ("MSU") are difficult. Pet. Ex. 20. at ¶¶ 4-6.

## IV. CONTENTIONS OF THE PARTIES

The parties' joint status report, filed on November 25, 2019, indicated that all items of damages aside from actual pain and suffering were resolved: $1,800.00 for past unreimbursable medical expenses, $400.00 in future unreimbursable medical expenses, and $3,607.16 in past lost earnings, for a total of $5,807.16. Joint Status Rept., filed Nov. 25, 2019, at 1-2 (ECF No. 45). The only disputed issue before the undersigned is the amount of damages to be awarded for Mr. Fedewa's actual pain and suffering.

### A. Petitioner's Position

Petitioner demands a minimum of $180,000.00 for actual pain and suffering. Pet. Mem. on Damages at 9. He explains that he suffered significant pain as a result of GBS and still suffers from fatigue. Id. at 7. Mr. Fedewa also explains that recovering from GBS "crushed his positive outlook on life and broke his spirit, to the great concern of everyone who knew him." Id. at 8. Additionally, petitioner compares his case to Johnson and finds that he experienced as much, if not more pain, than the petitioner in Johnson. Id. at 6-8. He notes that he experienced longer hospitalization than Ms. Johnson and was admitted to inpatient rehabilitation whereas Ms. Johnson was not. Id. at 7. He suffered limb weakness and difficulty swallowing unlike Ms. Johnson, and Mr. Fedewa had particularly traumatic experiences in the hospital. Id. at 6-7. Mr. Fedewa additionally contends that like Ms. Johnson's incontinence, he too had issues with his bowel movements during his hospitalization. Id. at 7. As the petitioner in Johnson was awarded $180,000.00, Mr. Fedewa states that he should be awarded no less than $180,000.00 for actual pain and suffering. Id. at 8. Petitioner does not seek future pain and suffering damages.

### B. Respondent's Position

Respondent proposes no more than $125,000.00 in actual pain and suffering damages. Resp. Br. on Damages at 1. In his brief, respondent recognizes that "GBS cases have historically

5

run the spectrum from cases involving severe sequelae requiring life care plans to assess prospective damages, to cases in which the petitioner nearly or completely recovers shortly after the six month minimum duration of symptomatology required to qualify for compensation." Id. at 12. Respondent argues that Mr. Fedewa's pain and suffering "demonstrates a less severe course of GBS than others, comparatively speaking." Id.

In response to petitioner's comparison to Johnson, respondent notes that Ms. Johnson had a different course with GBS post-hospitalization. Resp. Br. on Damages at 13. She dealt with "being unable to drive and walk on her own for months and being unable to tell when she needed to use the bathroom[], and she was still seeking care for the residual symptoms of her GBS two-to-three years after her initial diagnosis." Id. Respondent explains that Mr. Fedewa did not experience such significant difficulties afterwards: "[H]e was able to stop treatment for his GBS within a few months of its onset, and he did not suffer significant ongoing sequelae like incontinence. If comparing the two cases, as petitioner requests, the pain and suffering award should reflect that fact." Id. Respondent further notes that Johnson is not controlling precedent, but rather "one factor the Court can consider" and "a single, and not analogous, decision." Id. at 14.

**V.   DISCUSSION AND ANALYSIS**

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Human Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Human Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Human Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000." § 15(a)(4). In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. See I.D., 2013 WL 2448125, at *9-11 (citing McAllister, 1993 WL 777030, at *3). In evaluating these factors, the undersigned has reviewed the entire record, including medical records, affidavits submitted by petitioner and others, and hearing testimony.

**A.   Determining Petitioner's Award in This Case**

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

6

### i. Awareness of Suffering

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving GBS.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute.  Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of his suffering.

### ii. Severity of the Injury

Prior to Mr. Fedewa's hospital admittance, he sought medical treatment three times, complaining of progressively worsening numbness and weakness.  When Mr. Fedewa was admitted to Sparrow Hospital, he was hospitalized for approximately eight days then admitted to inpatient rehabilitation for five days post-hospitalization.  He reported terrible experiences with his lumbar puncture and EMG tests, and he had a difficult time with his five rounds of IVIG treatment.  Pet. Ex. 20 at ¶ 19.  His injury and treatment necessitated rehabilitation therapy which began during his hospitalization and continued in his inpatient rehabilitation stay.  He completed eleven sessions before he was discharged home and was discharged from outpatient physical therapy after completing twenty-two sessions over the span of three months.  He was unable to drive or work for three months.

Mr. Fedewa's affidavit and medical records establish GBS interfered with his ability to work.  He was unable to return to his dental repairman position for three months after his hospitalization.  At the age of fifty-four, Mr. Fedewa was working eight to twelve hours a day, five days a week, as a dental equipment repairman.  His job required him drive to service locations and to lift and move equipment up to 250 pounds.  Pet. Ex. 20 at ¶ 2.  When Mr. Fedewa returned to work approximately three months after his hospitalization, it was against the advice of his family and influenced by the pressure he felt to support his wife and seven children.  Id. at ¶ 33.  Although he returned to work, his physician requested a twenty-five pound weight restriction, one-tenth of the weight-lifting capacity his job required.  Pet. Ex. 14 at 62.  He averred that working was painful and difficult for many months.  Pet. Ex. 20 at ¶ 34.  He had to take breaks after each service call.  Id.

Mr. Fedewa's GBS course post-hospitalization required various medications.  Mr. Fedewa continued taking gabapentin for three months following his hospitalization.  He explained that he "stopped taking it as soon as he could tolerate the pain, in order to be able to return to work." Pet. Mem. on Damages at 7.  Mr. Fedewa required additional medication in the following months.  His anxiety required Wellbutrin in addition to Xanax, but when his anxiety lessened and he stopped taking his medication, he suffered depression.  His moderately severe depression required him to return to Wellbutrin.  In total, Mr. Fedewa took Wellbutrin for approximately fifteen months post-hospitalization.

GBS also altered Mr. Fedewa's family and social life.  He lives on a hobby farm on several acres of land with his wife and seven children.  Prior to GBS, he was physically active on his farm raising animals, tending to plants, and enjoying outdoor activities with his children.  He

7

was an active member in his community as well, routinely hosting church members for dinner. With his nineteen-year-old daughter, Mr. Fedewa handed out drinks and snacks to students at MSU from eight to midnight on Friday nights. However, Mr. Fedewa has not participated in the MSU student outreach since his injury because he cannot stay up after ten o'clock at night. Pet. Ex. 20 at ¶ 39. Mr. Fedewa has lost a part of his relationship with his nineteen-year-old daughter and cannot care for his younger children in the way he did prior to injury. Id. at ¶¶ 38-39. He is limited in his ability to participate in physical activities, such as biking and swimming, and service projects he used to enjoy.

### iii. Duration of the Suffering

Mr. Fedewa dealt with the residual symptoms of his GBS for over two and a half years. Mr. Fedewa stated that his "greatest loss has been the continuing trauma that has made life hard and took the joy out of living." Pet. Ex. 20 at ¶ 40. His wife noted, "Every day he complains about how hard everything is and how much he is hurting." Pet. Ex. 21 at ¶ 13. Mr. Fedewa reported continued numbness ten months after his diagnosis, and his medical records indicate muscle weakness as recent as April 17, 2018, a year and a half after his diagnosis with GBS. While muscle weakness and numbness in his extremities were not noted in his medical records after April 17, 2018 and Mr. Fedewa stopped taking Wellbutrin by July 25, 2018, Mr. Fedewa, in an August 2019 status report, noted that his chronic fatigue has not abated since his injury. See Pet. Status Rept., filed Aug. 9, 2019, at ¶ 9 (ECF No. 40). He further stated that he continues to experience depression and psychological issues. Id. Mr. Fedewa, who once regularly swam, walked, rode his bicycle, cut and split firewood, and performed home improvement projects, hopes to return to moderate bicycle riding and swimming.

## B. Comparison to Other GBS Awards

As noted in the Rule 5 Order, the undersigned preliminarily found petitioner's case comparable to Johnson, which proves helpful as reference in the undersigned's evaluation of Mr. Fedewa's situation. Similarly, Dillenbeck v. Secretary of Health & Human Services proves helpful in evaluating Mr. Fedewa's case given the similarity in facts. No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), aff'd in part, No. 17-418V, 2020 WL 582588, at *6 (Fed. Cl. Feb. 6, 2020) (remanded on lost wages damages, affirmed on pain and suffering).

### i. Johnson

Ms. Johnson was sixty-one when she diagnosed with GBS after receiving a flu vaccine, and was awarded $180,000.00 for actual pain and suffering. Johnson, 2018 WL 5024012, at *1-2. Ms. Johnson worked as a school bus driver for her local school district and as a part-time school librarian. Id. at *2. Ms. Johnson received a flu vaccine in November 2015 and was subsequently hospitalized for five days, from December 10 to December 15, 2015, for GBS. Id. at *3. She received a lumbar puncture and five rounds of IVIG. Id. She did not take gabapentin following her injury because she feared being dependent on medication and suffering adverse effects of medication. Id. at *7. After three months, she was approved to work half-days up to three times a week as a librarian, but could still not return to work as a school bus driver. Id. at *4. Approximately three and a half months after her diagnosis, Ms. Johnson was cautiously

driving again and walking without her walking sticks. Id. Subsequently, Ms. Johnson passed her physical examination in 2016 and returned as the school bus driver for the 2016-2017 school year. Id. Ms. Johnson had initially completed some in home therapy and three sessions of outpatient therapy between March 2016 and June 2016, but she did not partake in therapy between June 2016 and February 2017. See id. A little over a year after Ms. Johnson's hospitalization, she completed forty-five personal exercise visits between February 27, 2017 and February 26, 2018. Id.

At the time of her damages hearing in January 2018, over two years after her hospitalization, Ms. Johnson still reported GBS sequalae including incontinence, decreased work duties, fatigue, and residual numbness in her legs. Johnson, 2018 WL 5024012, at *5. She stated that she can no longer hike with her family and dog like she used to. Id. at *4. She also testified that incontinence meant that she was unable to tell when she needed to use the bathroom and traveled with spare clothing. Id. at *5. Finally, Ms. Johnson testified that she still had numbness in her legs and could not tell when her feet were cold. Id. Based on the facts and circumstances of the case, Ms. Johnson was awarded $180,000.00 for actual pain and suffering. Id. at *9.

### ii. Dillenbeck

Ms. Dillenbeck was sixty-one when she was diagnosed with GBS after receiving the flu vaccine. Dillenbeck, 2019 WL 4072069, at *1. She was awarded $170,000 for actual pain and suffering. Id. at *14-15. Ms. Dillenbeck was hospitalized for five days, from December 3 to December 8, 2015, then transferred into a rehabilitation center for five days until December 13, 2015. Id. at *2. She received two rounds of IVIG treatment during hospitalization and physical therapy three times a day during her five-day rehabilitation. Id. She attended and was discharged from outpatient physical therapy by the end of January 2016. Id. Ms. Dillenbeck returned to work on March 1, 2016, approximately three months after her hospitalization, though with a fifteen-pound weight restriction. Id. In April 2016, Ms. Dillenbeck requested to be free of work restrictions despite still reporting symptoms of paresthesia in hands and feet, chest sensitivity, and an unsteady gait. Id. Ms. Dillenbeck took gabapentin for the six months following her hospitalization. Id. at *3. At the time of her testimony in February 2019, Ms. Dillenbeck still reported GBS sequalae, including lack of sensation in hands and feels, increased sensitivity on chest, abdomen, and back, weakness in her hands, and generalized fatigue, and she continued to take prednisone for GBS sequalae. Id. at *3-4.

In addition to the similarities between Dillenbeck and case at hand, the special master in Dillenbeck found that damages for pain and suffering "reflect the personal cost of having to suffer GBS" and "the lost opportunity to continue to perform vet tech duties from which she clearly took great pleasure." Dillenbeck, 2019 WL 4072069, at *14. The special master accepted Ms. Dillenbeck's explanation that her quick return to work and release from restrictions was due to the pressure she felt to return to work rather than a reflection of her true health or readiness. Id. at *9-10.

9

### C. Petitioner's Pain and Suffering

The undersigned finds Mr. Fedewa's situation most similar to <u>Dillenbeck</u> and <u>Johnson</u>. Like Ms. Johnson, he received five rounds of IVIG treatment during his hospitalization, and like Ms. Dillenbeck, he was in rehabilitation for five days. However, petitioner's hospitalization was slightly longer than both Ms. Johnson's and Ms. Dillenbeck's, and he reported particularly painful experiences during his hospitalization.

Mr. Fedewa completed half the number of physical therapy sessions that Ms. Johnson completed in exercise therapy. However, his physical therapy sessions followed immediately after his hospitalization whereas Ms. Johnson was not admitted into inpatient rehabilitation nor did she participate in her exercise therapy until over a year from her hospitalization. While Ms. Dillenbeck was discharged from outpatient physical therapy within a month, Mr. Fedewa was not discharged from outpatient therapy for three months.

Regarding work interference, Ms. Johnson was only able to return to work part-time three months after her diagnosis, while both Ms. Dillenbeck and Mr. Fedewa returned to work full time after three months, albeit with weight restrictions. Even though Mr. Fedewa returned to work sooner than other individuals who have suffered from GBS, the undersigned finds Mr. Fedewa's explanation of his quick return to work reasonable. Mr. Fedewa was concerned about being moved onto long-term disability and being the sole provider for his wife and seven children. As noted in <u>Dillenbeck</u>, a petitioner returning to work quickly does not necessarily represent their health at the time or necessarily lessen the severity of their injury. <u>See Dillenbeck</u>, 2019 WL 4072069, at *3-4. In this case, Mr. Fedewa felt external pressures to return to work even though he likely was not ready.

Respondent notes in his Brief on Damages that a distinct difference between Mr. Fedewa's and Ms. Johnson's course post-hospitalization was Ms. Johnson's inability to drive for several months. However, the difference is only about a month: Ms. Johnson was driving four months after hospitalization and Mr. Fedewa was driving three months after hospitalization. Indeed Ms. Johnson's job as a school bus driver was completely impacted by an inability to drive, as driving is the job, but Mr. Fedewa's job also required him to drive from service location to service location. The difference in duration of inability to drive between Mr. Fedewa and Ms. Johnson is not medically significant in the undersigned's determination of petitioner's actual pain and suffering.

The greatest difference between the cases is the residual sequelae each petitioner experienced. Ms. Johnson continued to experience incontinence, fatigue, and some numbness in her legs two years post-hospitalization. Her bladder and bowel incontinence was particularly significant. Ms. Johnson did not continue gabapentin or other medication for her residual sequelae due to her fear of medication. Ms. Dillenbeck continued to experience lack of sensation in extremities, weakness in her hands, increased sensitivity on chest, abdomen, and back, and generalized fatigue two and a half years post-hospitalization. As of her testimony in 2019, she continues to take prednisone.

Mr. Fedewa's residual sequelae mostly consists of fatigue and emotional distress. Unlike Ms. Johnson and Ms. Dillenbeck, Mr. Fedewa has not reported numbness or weakness in his extremities since a year and a half post-hospitalization. He did not report incontinence or additional bodily pain. However, neither Ms. Dillenbeck or Ms. Johnson were treated for anxiety or depression. Mr. Fedewa's anxiety and moderately severe depression required him to take Wellbutrin for over a year. Additionally, as the special master in Dillenbeck considered inability to perform duties from which petitioner takes great pleasure, Mr. Fedewa's limitation in caring for his children as a father is a considerable suffering. At the time of his injury, two of his children were young, requiring physical care that Mr. Fedewa could not provide. See Pet. Ex. 18 at 1-2. He was also unable to perform parental duties for his older children. His limited capacity to play with, care, and support his children resulted in substantial pain.

Though the type of actual pain and suffering Mr. Fedewa experienced is different from Ms. Johnson's and Ms. Dillenbeck's, Mr. Fedewa's actual pain and suffering is comparable to Ms. Johnson's and slightly more severe than Ms. Dillenbeck's.

For all of the reasons discussed above, and based on consideration of the record as a whole, the undersigned finds that $180,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering and emotional distress.

## VI.  CONCLUSION

In light of all of the above, the undersigned awards the following compensation:

**A lump sum payment of $185,807.16, representing $180,000.00 for actual pain and suffering and $5,807.16 for unreimbursed medical expenses and past lost wages, in the form of a check payable to petitioner, Bruce Fedewa.**

This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[3]

**IT IS SO ORDERED.**

s/Nora Beth Dorsey  
Nora Beth Dorsey  
Special Master

---

[3] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.